# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STANLEY PIESESKI and PATRICK KOST, <br><br> Plaintiffs, <br><br> v. <br><br> Northrop GRUMMAN CORPORATION and Northrop GRUMMAN ELECTRONIC SENSORS & SYSTEMS DIVISION PENSION PLAN, <br><br> Defendants. | 2:01-cv-993 |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is DEFENDANTS' MOTION FOR RECONSIDERATION (Document No. 157).[1]  Defendants filed a brief in support and several exhibits, Plaintiffs filed a brief in opposition with an attached exhibit and Defendants filed a reply brief.   The motion is ripe for disposition.

Factual Background

This complex ERISA class action case arose out of a corporate transaction between Defendants ("Northrop Grumman") and Westinghouse Electric Corporation ("Westinghouse").[2] As a result, Northrop Grumman acquired the assets of the Westinghouse Electric Systems Group in which Plaintiffs had been employed.   When that business unit had been part of Westinghouse, Plaintiffs had been entitled to numerous employee benefits under the Westinghouse Pension Plan,

---

[1]Also pending before the Court is DEFENDANTS' MOTION PROPOSING FINAL REMEDY (Document No. 150).

[2]Subsequent to the transaction, Westinghouse changed its name to CBS, Inc., and is now known as Viacom, Inc.   For clarity and consistency, the Court will use the term "Westinghouse."

including Permanent Job Separation ("PJS") benefits.    Pursuant to the January 3, 1996 Asset Purchase Agreement ("Northrop Grumman APA"), effective March 1, 1996, Northrop Grumman offered employment to the former Westinghouse employees and agreed to provide employee benefits comparable to those in effect at Westinghouse on the closing date.    The Court will summarize the relevant provisions of the applicable documents.

1994 Westinghouse Plan

The Westinghouse Pension Plan in effect on March 1, 1996 had been adopted in 1994. The Westinghouse Plan ¶ 34 defined "Permanent Job Separation" to require a "Qualifying Termination" of a worker's employment with Westinghouse:    **"For periods on or after January 1, 1997 and before September 1, 1998, a Permanent Job Separation means solely the termination of the employment of an Employee with an Employer[3], an Affiliated Entity, or Excluded Unit because of job movement or product-line relocation, or location closedown**." The definition of PJS benefits also contained a "Successor Employer" provision:    **"Also, for all periods, in no event shall a Permanent Job Separation occur if an Employee is offered continued employment by an Employer, Affiliated Entity, Excluded Unit, or a Successor Employer which is neither an Employer, Affiliated Entity, nor an Excluded Unit.**"

The 1994 Plan definition of PJS benefits was amended to insert a "Sunset" provision:    **"In no event shall a Permanent Job Separation occur after August 31, 1998.**"    The 1994 Plan also narrowed the entitlement to PJS benefits by requiring the loss of employment to result from a "job movement, product line relocation or location closedown."

---

[3]  The 1994 Westinghouse Plan defined "Employer" as Westinghouse and its affiliates.

<u>1992 Westinghouse Plan</u>

The pre-1994 Westinghouse Plan had been adopted in 1992 (*see* Defendants' Motion

Proposing Final Remedy, Exhibit I, ¶ 25).    The 1992 definition of PJS benefits had no "Sunset"

provision and applied somewhat broadly to any loss of employment through no fault of the

employee "for lack of work for reasons associated with the business."    However, the 1992 Plan

contained "Qualifying Termination" and "Successor Employer" provisions which remained

substantially the same in the 1994 Plan.

The actual text of the 1992 Plan (emphasis added) reflects:

> **25.    Permanent Job Separation means the termination of the employment
> of an Employee with an Employer** or Affiliated Entity on or after September 1,
> 1988 through no fault of his own for lack of work for reasons associated with the
> business for whom an Employer or Affiliated Entity determines there is no
> reasonable expectation of recall.    **In no event shall a Permanent Job Separation
> occur if an Employee is offered continued employment by an Employer, an
> Affiliated Entity, or a successor employer which is neither an Employer nor
> an Affiliated Entity.**    An Employee who is on Layoff status shall not be deemed a
> Permanent Job Separation provided, however, that if such an Employee continues
> on Layoff for one year without an offer of employment by an Employer or
> Affiliated Entity, a Permanent Job Separation shall be deemed to occur one year
> from the original date of Layoff**.**

<u>Northrop Grumman APA</u>

Turning to the specific language of the Northrop Grumman APA (executed January 3,

1996, effective March 1, 1996), Northrop Grumman agreed to offer employment to the Active

Employees of Westinghouse and to honor any legal obligation of Westinghouse to re-employ

Inactive Employees (for example, those on disability or military leave).    Northrop Grumman also

contractually agreed to provide and maintain "**compensation and benefit plans and

arrangements which in the aggregate as to each Transferred Employee are comparable to

the wages and benefits in effect on the date of this Agreement . . . .**"    APA § 4.5(a)(ii).    In

addition, in APA § 1.3 (Assumption of Liabilities), Northrop Grumman assumed and agreed to hold Westinghouse harmless from "**all obligations and liabilities of Sellers and the Sold Subsidiaries of any nature, whether known or unknown, absolute, accrued, contingent or otherwise and whether due or to become due**" with respect to the Acquired Assets. Specifically included within the Assumption of Liabilities by Northrop Grumman were: (v) "**all obligations and liabilities relating to the employment or termination of employment of any employee**"; and (vi) "**to the extent provided in Section 4.5, all obligations or liabilities arising under or in connection with any bonus, pension, profit sharing, deferred compensation, retirement, vacation, severance pay, . . . or other similar plan, arrangement or understanding (whether or not legally binding) providing benefits, including postretirement benefits, to Division or Center employees**." In addition, APA § 4.5(e) provided that Northrop Grumman would indemnify and hold Westinghouse harmless from "**any claims made by any Transferred Employee for severance or other separation benefits, from any claims based on breach of contract and from any other claims arising out of or in connection with the employment or the failure to offer employment to, or the termination of employment of, any Transferred Employee or the transactions contemplated hereby**. . . ."[4]

---

[4]Similarly, the Northrop Grumman Pension Plan Appendix E § E.01(b) provides: "This Plan assumes the liabilities of the Westinghouse Plan with regard to those participants of the Westinghouse Plan who became Employees of the Northrop Grumman controlled group as a result of the ESSD Acquisition. Accordingly, benefits earned by Participants of this Plan under the Westinghouse Plan before March 1, 1996 are payable under this Appendix."

Northrop Grumman Pension Plan

In accordance with the Northrop Grumman APA, on February 29, 1996 Northrop Grumman established a pension plan that went into effect on March 1, 1996, the effective date of the acquisition. The Plan sponsor is Northrop Grumman. Sections 2.03 and 2.11 of the Northrop Grumman Pension Plan define the "Company" as Northrop Grumman and its affiliates. Plan § 1.05 states that it **"was established as a successor to the Westinghouse Pension Plan** . . . **for the benefit of employees of [Westinghouse] as of February 29, 1996 who became employees of [Northrop Grumman] as of March 1, 1996** . . . ." Appendix E § E.01(a) states: "**This Plan is intended to be a continuation of the Westinghouse Plan with only minor changes**."

Section 2.37 of the Northrop Grumman Pension Plan defines the Northrop Grumman PJS benefit, which parallels the 1994 Westinghouse PJS benefit in many respects. The Northrop Grumman plan has a "Qualifying Termination" provision, albeit which provides that the PJS benefit is triggered by the termination of employment of an employee "**with the Affiliated Companies**" (i.e., Northrop Grumman). Also, the Northrop Grumman Plan has a "Sunset" provision: "**In no event shall a Permanent Job Separation occur after August 31, 1998**." Additionally, the Northrop Grumman Plan has a "Successor Employer" provision, which provides: "**in no event shall a Permanent Job Separation occur if an Employee is offered continued employment by an Affiliated Company, or a Successor Employer which is not an Affiliated Company**" (i.e., a successor to Northrop Grumman).

In 1999, Northrop Grumman terminated Plaintiffs' employment and thereafter rejected their claims for PJS benefits. In 2000, the United States Court of Appeals for the Third Circuit held in *Bellas v. CBS, Inc.*, 211 F.3d 517 (3d Cir. 2000), that the 1994 amendment to the

Westinghouse Plan violated the "anti-cutback" provision of ERISA § 204(g), 29 U.S.C. § 1054(g).

Procedural Background

This litigation followed. On May 31, 2001, Plaintiffs filed their Complaint in this Court, alleging: (1) that Northrop Grumman violated the ERISA anti-cutback provision, 29 U.S.C. § 1054(g); and (2) that Northrop Grumman breached its fiduciary duty with respect to the Plan pursuant to 29 U.S.C. § 1104(a). The case was initially assigned to Judge William Standish and referred to former Magistrate Judge Ila Jeanne Sensenich for pretrial proceedings. Defendants filed a motion to dismiss the Complaint. Shortly thereafter, the parties filed cross-motions for summary judgment as to Count I of the Complaint.

On April 22, 2002, Magistrate Judge Sensenich issued a Report and Recommendation ("R&R") which recommended that the motion to dismiss be denied, and that Plaintiffs' motion for partial summary judgment be granted and held that the Sunset provision in the Northrop Grumman Plan violated the ERISA anti-cutback provision such that Plaintiffs were entitled to PJS benefits. The R&R was adopted by Judge Standish as the opinion of the Court on June 27, 2002 (the "2002 Order"). Defendants now seek reconsideration of the 2002 Order, which will be reviewed in detail below. The Court of Appeals for the Third Circuit denied the parties' petition for interlocutory appeal of the 2002 Order.

In 2003, Northrop Grumman filed a third-party complaint against Westinghouse, seeking contribution and indemnification under ERISA and New York state law. Shortly thereafter, Judge Standish recused and the case was assigned to this member of the Court. Also, Magistrate Judge Sensenich had retired and the case was referred to former Magistrate Judge Amy Reynolds Hay for pretrial proceedings. In 2004, class certification was granted for a class consisting of:

"All persons who were participants in the Westinghouse Plan as of January 1, 1994 and who were laid off by Northrop Grumman after December 31, 1996 under circumstances meeting the pre-Amendment requirements for a PJS Pension (excluding any such persons who received a PJS Pension)."

On March 18, 2005, Magistrate Judge Hay issued an R&R which recommended that summary judgment be granted in favor of Westinghouse and against Northrop Grumman on the third-party complaint (Document No. 92). The R&R was adopted as the opinion of the Court by Order dated April 25, 2005. The Court held that Northrop Grumman's ERISA claims against Westinghouse failed because Northrop Grumman was seeking to enforce the terms of the APA, as opposed to the terms of an employee benefit plan. The Court also held that Northrop Grumman's state law claims failed because, in the Northrop Grumman APA, Westinghouse had divested itself of (and Northrop Grumman had assumed) all liability with respect to severance payments to transferred employees. The Court rejected Northrop Grumman's argument that, pursuant to the APA, it was only obligated to provide severance benefits "in effect on the date of this Agreement." Instead, the Court held that under the broad language of the Northrop Grumman APA § 1.3, "there appears to be little that Northrop did not agree to assume." The Court also cited the Northrop Grumman APA § 4.5(e)(Northrop's agreement to indemnify and hold Westinghouse harmless from "any claims made by any Transferred Employee for severance or other separation benefits"). The Court further explained that pursuant to the Northrop Grumman APA, Northrop Grumman was required to take the employees' prior service with Westinghouse into account and was required to provide "severance benefits comparable to what Westinghouse would have been obligated to pay if the APA had never been entered into." The Court concluded that "Northrop intended to adopt Westinghouse's overall plan and assume complete responsibility of paying

7

severance benefits" and rejected the idea that Northrop Grumman's duty was limited to the provision of comparable benefits going forward.   The Court commented that whether the Northrop Grumman Plan violates ERISA "does not alter the obligations Northrop agreed to assume under the APA."   Northrop Grumman does not now explicitly seek reconsideration of the 2005 decision, although it does raise contradictory legal arguments.

On June 30, 2006, this Court adopted an R&R of Magistrate Judge Hay which:   (1) declared that Northrop Grumman Plan's incorporation of the Westinghouse 1994 Amendment was in violation of §§ 204(g) and 208 of ERISA, 29 U.S.C. §§ 1054(g) and 1058; (2) entered judgment for all class members who satisfied the pre-amendment conditions for the PJS Pension, for the difference between what they should have received and what they actually received, with pre-judgment and post-judgment interest at the statutory rate set forth in 28 U.S.C. § 1961, subject to setoffs; (3) denied Plaintiffs' request regarding retiree medical, life insurance, and any other benefits that accompanied the PJS Pension; and (4) denied without prejudice Plaintiffs' request for counsel fees and costs.   The parties filed cross appeals, which were dismissed for lack of jurisdiction by the Court of Appeals for the Third Circuit.   In a Certified Court Order on April 4, 2008, the Court explained: "Because the final award of damages depends on whether the class members elect an annuity or a lump sum and the parties may dispute the amount of the severance benefits that will offset the award, the June 30, 2006 order is not final."   The case was remanded for further consideration.   Unfortunately, thereafter Magistrate Judge Hay suffered a serious illness and died.   In 2010, Northrop Grumman filed a Motion Proposing Final Remedy, in an effort to resolve the lack of finality.   Plaintiffs opposed Northrop Grumman's "proposed final remedy" for numerous reasons.   The matter has been fully briefed and is under consideration by the Court.   Resolution of the "proposed final remedy" has been set aside, however, due to

Northrop Grumman's pending Motion for Reconsideration.

On February 29, 2012, the Court of Appeals for the Third Circuit issued a precedential opinion in the case of *Shaver v. Siemens Corp.*, 670 F.3d 462 (3d Cir. 2012). *Shaver* involved similar legal issues regarding the right of former Westinghouse employees to recover PJS benefits from a successor employer, albeit pursuant to an asset purchase agreement between Westinghouse and Siemens in 1998 which was not identical to the terms of the Northrop Grumman APA. Nevertheless, Northrop Grumman contends that the legal analysis in *Shaver* requires a reversal of the 2002 Order and entry of judgment in its favor on all counts of the Complaint.

Legal Background

The legal landscape is tortuous and complex. The most important decisions are hereafter summarized in chronological order.

1.      *Bellas v. CBS, Inc*.

*Bellas*, 221 F.3d at 517, was decided in 2000, some four years after the Northrop Grumman APA was finalized. The primary issue in *Bellas* was whether PJS benefits were covered by ERISA. Specifically, the parties disputed whether a PJS benefit constituted an "early retirement benefit" or a "retirement-type subsidy" the latter of which would be protected by the anti-cutback provision of ERISA § 204(g). The Court conceptually bifurcated the PJS benefits at issue, and held that the portion of the PJS benefit that is equal to the actuarially reduced normal retirement benefit is an early retirement benefit, while any benefits paid in excess of the actuarially reduced value constitute a retirement-type subsidy. 221 F.3d at 538. Thus, the retirement-type subsidy portion of the PJS benefit is governed by ERISA. The Court then held that the PJS

retirement-type subsidy benefits accrued upon their <u>creation</u> rather than upon the occurrence of the unpredictable contingent event (job separation) and thus were protected from cutback by § 204(g). In reaching this conclusion, the Court rejected the interpretation of the parallel tax statute by the IRS. *Id*. at 530-32 & n.12. *Bellas* concluded that the 1994 Amendment to the Westinghouse Pension Plan had changed the PJS benefit by: (1) narrowing the definition of "PJS" by requiring the loss of employment to have resulted from a "job movement, product line relocation or location closedown"; and (2) eliminating the PJS benefit in toto for terminations on or after September 1, 1998 (i.e., the "Sunset" provision). In sum, the Court held that the Westinghouse 1994 Plan Amendment of PJS benefits violated the anti-cutback provision § 204(g) of ERISA.

The *Bellas* opinion did not discuss the "Successor Employer" or "Qualifying Termination" provisions of the Westinghouse Plan. Nor did it discuss the effect of an asset purchase agreement, a spin-off plan, or ERISA § 208.


2. The 2002 *Pieseski* Order

In her April 22, 2002 R&R in this case, Magistrate Judge Sensenich resolved cross-motions for summary judgment on Count I of the Complaint, which had alleged a violation of the anti-cutback provision of ERISA, § 204(g). The Magistrate Judge first determined that the ERISA claims were not barred by the statute of limitations.[5] She then turned to the issue, as she framed it, of whether *Bellas* "applies to the Northrop Plan such that its provision eliminating PJS benefits constitutes an illegal amendment under ERISA, thus requiring Defendants to make payment of PJS benefits to eligible Northrop Grumman beneficiaries." R&R at 3.

---

[5]The statute of limitations argument is not now at issue.

Northrop Grumman contended that it could not be liable for PJS benefits because: (1) the Northrop Grumman Plan never provided such benefits, and had included the Sunset provision since its inception; and (2) the Northrop Grumman Plan was never amended to reduce or eliminate such benefits. Magistrate Judge Sensenich disagreed. Relying on *Bellas*, she concluded that Northrop Grumman's "adoption of the 1994 Amendment into the Northrop Plan, effectively denying Plaintiffs their PJS Pension benefits, also constitutes a similarly illegal amendment of the Northrop Plan and is therefore a violation of Section 204(g) of ERISA." R&R at 13. Magistrate Judge Sensenich reasoned that Northrop Grumman had "effectively amended the Northrop Plan when they erroneously interpreted the 1994 Amendment, which eliminated the PJS Pension in the Westinghouse Plan as giving them similar authority to eliminate the PJS Pension from their continuation of the Plan by adopting the illegal 1994 Amendment into the Northrop Plan." R&R at 15-16 (*citing Hein v. FDIC,* 88 F.3d 210, 216-17 (3d Cir. 1996) for the proposition that a plan "interpretation" which improperly denies benefits constitutes an illegal amendment).

In addition, Magistrate Judge Sensenich concluded that Northrop Grumman's Plan was a continuation (or "spin-off") of the Westinghouse Plan, rather than a newly created successor plan, and therefore Northrop Grumman was obligated under ERISA § 208 to provide benefits equal to those in the Westinghouse Plan. R&R at 16. Magistrate Judge Sensenich noted that Appendix E of Northrop Grumman Plan explicitly stated that it was intended to be a continuation of the Westinghouse Plan. She further noted that § E.01(b) of the Northrop Grumman Plan "assumes the liabilities of the Westinghouse Plan with regard to those participants of the Westinghouse Plan who became Employees of Northrop Grumman." Magistrate Judge Sensenich reasoned that pursuant to *Bellas*, "one of the liabilities of the Westinghouse Plan towards its employees was the provision of PJS Pension benefits to eligible employees regardless of the 1994 Amendment which

11

eliminated them." R&R at 17. In sum, Magistrate Judge Sensenich concluded that because Westinghouse owed PJS benefits and the Northrop Grumman Plan was a spin-off plan, Northrop Grumman was required to provide "equal" PJS benefits.

Furthermore, Magistrate Judge Sensenich observed that the transfer of employment from Westinghouse to Northrop Grumman was not a bar to recovery. R&R at 19-20. Citing *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1145-46 (3d Cir. 1993), she explained that transferred employees may qualify for benefits if they meet pre-1994 amendment eligibility requirements while working for the Successor Employer. She further reasoned that the combined effect of ERISA §§ 204(g) and 208 required a spin-off plan to fund the early retirement benefits for those who would, after the transfer, qualify by service with a Successor Employer. Thus, she concluded that Plaintiffs may qualify for PJS benefits "if they meet the pre-amendment eligibility conditions of the same provision in the Westinghouse Plan." R&R at 20. However, Magistrate Judge Sensenich did not analyze the pre-amendment eligibility conditions set forth in the Westinghouse Plan, specifically, the "Qualifying Termination" and "Successor Employer" provisions. Nor did she analyze the specific terms of the Northrop Grumman APA. Instead, she concluded that Northrop Grumman "could not invoke the illegal 1994 amendment to deny its employees benefits equal to those provided in the Westinghouse Plan." R&R at 18.


3. *Shaver v. Siemens Corp.*

The terms and circumstances of the corporate transactions at issue in *Shaver* and this case differed substantially. *Shaver* involved an asset purchase agreement executed between Westinghouse and Siemens Corporation ("Siemens") on August 19, 1998 – more than two years after the Northrop Grumman APA and only two weeks prior to the activation of the "Sunset"

12

provision in the 1994 Westinghouse Plan.   Moreover, Siemens and Westinghouse specifically altered the closing date – for pension and benefit purposes only -- to September 1, 1998, the effective date of the Westinghouse Sunset provision.[6]   *Id.* at 468 & n.5.   The Siemens Plan became effective as of September 1, 1998.   Accordingly, there was no need to include a Sunset provision in the Siemens Plan.

On the other hand, there are numerous similarities between the transactions.   *Shaver* addressed the same 1994 amendment to PJS benefits in the Westinghouse Pension Plan that is at issue in this case.   Moreover, in *Shaver* the Court of Appeals criticized and reversed an R&R prepared by Magistrate Judge Sensenich, who also authored the 2002 Order in this case.   As part of the respective transactions, Siemens and Northrop Grumman each agreed to offer employment to the former Westinghouse employees.   The Siemens APA required Siemens to establish a defined benefit pension plan for the legacy employees which contained terms and conditions substantially identical with respect to all substantive provisions to those of the Westinghouse Pension Plan "as in effect as of the Closing Date of the APA" and to provide compensation and benefit plans and arrangements "which in the aggregate are comparable to those of the Westinghouse Plan as of the closing date."   *Id.* at 467.

After the transaction was finalized, Siemens adopted a pension plan which largely mirrored the Westinghouse Plan, but did not provide PJS benefits.   In 1999, Siemens terminated the former

---

[6]  In the Siemens APA, the parties contractually allocated responsibility for pension benefits for the two-week period between August 19 and September 1, 1998 to Westinghouse. Accordingly, Westinghouse amended the Westinghouse pension plan to offer the legacy employees, though only for benefit accrual purposes, credit for service and compensation from August 19 through August 31, 1998, even though Siemens became their employer as of August 19.   In turn, Siemens agreed not to terminate any legacy employee other than for cause prior to September 1, 1998, and agreed that if it nevertheless did so it would "reimburse [Westinghouse] for any actuarial pension loss caused by any such termination."   *Id.* at 468.

Westinghouse employees and refused their claims for PJS benefits. Litigation followed. The district court adopted an R&R from Magistrate Judge Sensenich which concluded that Siemens had violated ERISA by denying the claims for PJS Benefits.

In an opinion by Judge Greenberg (who also authored *Bellas*), the Court of Appeals for the Third Circuit reversed the district court. Judge Greenberg began his analysis by setting forth a number of core principles: (1) ERISA neither mandates the creation of pension plans nor dictates the benefits to be afforded once a plan is created; (2) ERISA was enacted to ensure that if a worker has been promised a defined pension benefit and has fulfilled whatever conditions are required to obtain it, he/she will actually receive that benefit; (3) only the plan itself can create an entitlement to benefits; and (4) courts are to enforce the plan as written unless a provision of ERISA contains a contrary directive. *Id*. at 470-71 (citations omitted). The Court noted that "[b]y their plain terms, the Siemens Plans do not provide for PJS benefits." *Id*. at 471. Judge Greenberg then rejected the theory that Siemens had created an ERISA "transition plan" for the two-week period in August 2008, by reasoning that Siemens had not "established or maintained" (i.e., "sponsored") that plan. The Court then turned to the "hyper complicated" analysis of ERISA §§ 204(g) and 208, 29 U.S.C. §§ 1054(g) and 1058, which the Magistrate Judge had determined trumped the plain language of the Siemens Plan. *Id.* at 475.

### a. *Shaver*'s Analysis of Section 208

ERISA § 208 provides, in relevant part:

A pension plan may not merge or consolidate with, or transfer its assets or liabilities to, any other plan after September 2, 1974, unless each participant in the plan would (if the plan terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer (if the plan had then terminated).

29 U.S.C. § 1058. Magistrate Judge Sensenich had concluded in *Shaver* that § 208 applied because the Siemens APA provided for Westinghouse to transfer liabilities to the Siemens Plans, and therefore, that § 208 required Siemens to offer identical PJS benefits. Judge Greenberg separated the § 208 analysis into two distinct steps.

First, Judge Greenberg considered whether the Siemens APA triggered application of § 208. Judge Greenberg noted that neither § 208 nor ERISA's other provisions explicitly outline circumstances under which a transfer of liabilities has occurred. *Shaver*, 670 F.3d at 479. However, he was guided by corresponding Treasury Regulations[7], which state, "[a] 'transfer of assets or liabilities' occurs when there is a diminution of assets or liabilities with respect to one plan and the acquisition of these assets or the assumption of these liabilities by another plan." *Id.* (*quoting* 26 C.F.R. §§ 1.414(*l*)–1(b)(3)). Judge Greenberg turned to the Siemens APA to determine whether such a transfer had occurred.

Under the relevant provisions of the Siemens APA, Siemens promised (1) to "provide compensation and benefit plans and arrangements *which in the aggregate are comparable . . .* to the compensation, Plans, and Benefit Arrangements [already in effect for the legacy employees]; and (2) to establish a defined benefit pension plan containing "terms and conditions *that are substantially identical with respect to all substantive provisions to those of the Westinghouse Pension Plan as in effect as of [September 1, 1998]*." *Id.* at 480 (emphasis in original). Judge

---

7 Upon the enactment of Title I of ERISA, the Internal Revenue Code was amended by Title II of ERISA "to condition the eligibility of pension plans for preferential tax treatment on compliance with many of the Title I requirements." *Shaver*, 670 F.3d at 471 n. 10 (*quoting Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 746 (2004). As a result, the Internal Revenue Code now contains sections of text taken almost verbatim from Title I of ERISA. *Id.* Accordingly, the Treasury Regulations and Revenue Rulings implementing and interpreting these provisions of the Internal Revenue Code may serve as a guide when interpreting parallel provisions of ERISA. *Id.* (*citing Gillis*, 4 F.3d 1137, 1144–45 (3d Cir. 1993).

Greenberg noted that a promise to provide "comparable" benefits is different from a promise to provide "substantially identical" benefits. *Id.* at 480 n. 16. He also commented that "Siemens' contractual promise to provide substantially identical benefits surely does not constitute an assumption of Westinghouse Plan's liabilities, as an agreement to provide benefits is discrete from an agreement to assume another employer's obligation to provide benefits." *Id.* at 480–481. In other words, Siemens' offer to provide comparable benefits did not trigger application of § 208.

However, Judge Greenberg then scrutinized the "Assumed Liabilities" and "Excluded Liabilities" provisions of the Siemens APA. He concluded that Siemens had assumed a portion of the Westinghouse Plan pension obligations, such that § 208 was, in fact, triggered. *Id.* at 482. Additionally, Judge Greenberg determined that in § 208, the term "liabilities" includes "contingent liabilities," such as the responsibility to pay PJS benefits to a participant who meets the eligibility requirements after the plan is terminated. *Id.* at 483. In summary, even though Judge Greenberg recognized that the Siemens Plan was not a "spinoff plan," he concluded that § 208 was nevertheless triggered because Siemens had assumed a portion of the Westinghouse Plan pension obligations. *Id.* at 484–485.

Judge Greenberg then turned to the "distinct question" of whether § 208 required Siemens to pay PJS benefits. He explained that § 208 "is more nuanced than the Magistrate Judge recognized" and does not "impose a blanket requirement that Siemens adopt verbatim the Westinghouse Plan (or a more generous benefit plan). Rather, it protects appellees' accrued benefits with those benefits determined as of a hypothetical termination of the Westinghouse Plan just prior to the transfer of liabilities." *Id.* at 485. Judge Greenberg explained that to apply § 208, a court is required to perform a "hypothetical termination" analysis. It must "compare (a) the benefits, if any, that the participants would have received if the original plan had terminated just

16

before the merger or transfer with (b) the benefits, if any, that the participants would have received if the successor plan had terminated just after the merger or transfer." *Id.* at 471 (citing Justice Alito's concurrence in *Gillis*; internal punctuation omitted). "Thus, section 208 essentially requires that a plan participant receive no less benefits upon a hypothetical termination of the successor plan just following the merger or transfer of assets or liabilities than the participant would have received upon a hypothetical termination of his or her original plan just prior to the merger or transfer." *Id.* at 472.

Applying these principles, Judge Greenberg held that the former Westinghouse employees were not entitled to PJS benefits under a hypothetical termination analysis due to the Successor Employer provision. The Westinghouse Plan contained an express limitation that "in no event shall a Permanent Job Separation occur if an Employee is offered continued employment by … a Successor Employer." *Id.* at 489. Judge Greenberg reasoned that it was impossible for the Plaintiffs to fulfill this eligibility condition for PJS benefits under the Westinghouse Plan because Plaintiffs had, in fact, been offered continued employment by a Successor Employer, i.e., Siemens. *Id.* at 490–491.

Judge Greenberg explained that the Magistrate Judge's reliance on *Gillis* as authority to disregard the Successor Employment provision was "plainly wrong." *Id.* at 489. Judge Greenberg explained that "*Gillis* does not stand for the broad proposition that service with a Successor Employer may be treated as service for the plan sponsor to the end that all conditions the plan sponsor places upon retirement benefits are obviated." *Id.* at 490. Although the *Gillis* Court had concluded that employees may satisfy eligibility requirements (such as age and years-of-service) by service under the Successor Employer, Judge Greenberg emphasized that "a plan participant nevertheless must, at some point, meet all of the conditions placed upon those

benefits to receive them." *Id.*[8]  The Court of Appeals held in *Shaver* that the "Successor

Employer" provision "is an explicit bar to eligibility that, quite aside from the Sunset provision in

the Westinghouse Plan, forever disqualifies appellees from receiving PJS benefits."  *Id.* at 490.

Judge Greenberg further explained:

> Accordingly, we are at a total loss as to how, as appellees urge that we do, we can
> circumvent this explicit condition of the Westinghouse Plan by somehow treating
> appellees' service with Siemens as uninterrupted service with Westinghouse and,
> directly contrary to the terms of the Westinghouse Plan, ignore appellees'
> employment by Siemens.   We decline to engage in such judicial alchemy.

*Id.* at 491.

In addition, Judge Greenberg concluded that the "Qualifying Termination" provision

independently prevented Plaintiffs from being able to satisfy the eligibility requirements of the

Westinghouse Plan.  *Id.*   He cited *Gritzer v. CBS, Inc.*, 275 F.3d 291, 297 (3d Cir. 2002) (also

addressing PJS benefits), which held that a successor company was not an "Employer" as defined

in the Westinghouse Plan, such that the termination of Gritzer's employment by Industrial

Ceramics "was plainly not a Qualifying Termination under the PJS benefits provision."  *Shaver*,

670 F.3d at 491.   Judge Greenberg noted that similarly, under the language of the Westinghouse

Plan, PJS benefits were triggered only if the plaintiffs' employment was terminated by the

"Employer" (defined as a Westinghouse affiliate).   The plaintiffs' termination by <u>Siemens</u> was

not within this definition.  *Id.*

In sum, even though *Bellas* invalidated the 1994 "Sunset" provision of the Westinghouse

Plan, the plaintiffs in *Shaver* were not entitled to PJS benefits from Siemens under § 208.   Judge

Greenberg's analysis was based on the "Successor Employer" and "Qualifying Termination"

provisions of the Westinghouse Plan.

---

[8] The Court noted that *Gillis* involved a "spinoff plan."

b.    *Shaver*'s Analysis of Section 204(g)

Section 204(g) is known as the "anti-cutback" rule, and prohibits an employer from decreasing or eliminating a participant's accrued benefits by plan amendment.   *See* 29 U.S.C. § 1054(g).   Section 204(g) provides, in relevant part:

> (1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(d)(2) or 1441 of this title.
>
> (2) For purposes of paragraph (1), a plan amendment which has the effect of --
>
> (A)  eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or
>
> (B)  eliminating an optional form of benefit,
>
> with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits.   In the case of a retirement-type subsidy, the preceding sentence shall only apply with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy….

In *Shaver*, Judge Greenberg first rejected the theory that Siemens had established a "transition plan" for the thirteen days in August 1998 and that the subsequent adoption of the Siemens Plan constituted an improper "amendment" of the transition plan.   Judge Greenberg then rejected the Magistrate Judge's alternate rationale.   Based on the conceptual bifurcation of PJS benefits in *Bellas*, the Magistrate Judge determined that the employees were required to establish eligibility for the portion of PJS benefits constituting a "retirement-type subsidy" but that there was no pre-condition for plaintiffs to obtain the "early retirement benefit" portion.   *Id.* at 486. Judge Greenberg disagreed, noting that it was based on a "misreading of section 204(g)."   *Id.* Judge Greenberg recognized that the § 204(g) discussion of PJS benefits in *Bellas* had "clouded the disposition of this case in the District Court."   *Id.* at 485.    Additionally, Judge Greenberg

19

emphasized that the Court in *Bellas* had invalidated the 1994 Sunset Provision amendment only "as to Westinghouse." *Id.* at 474.

Specifically, Judge Greenberg explained that the Magistrate Judge failed to recognize that § 204(g) "can protect an entitlement to benefits, *but it cannot create an entitlement to benefits when no entitlement exists under the terms of the [p]lan.*" *Id.* at 486 (*quoting Hein*, 88 F.3d at 217 (emphasis added in *Shaver*). Judge Greenberg then explained that § 204(g) protects a benefit only to the extent a plan participant has satisfied, or later could satisfy, the pre-amendment conditions placed upon that benefit. Thus, the 1994 Westinghouse Plan amendments would have had to allow employees who remained employed by Westinghouse after the amendments to grow into the benefit, but did not foreclose subsequent employers from circumscribing the availability of such an optional benefit when it was being created. *Id.*

The appeals court found that § 204(g) "does not protect from cutback an early retirement benefit for a plan participant who has not satisfied and never can satisfy the conditions for receiving the benefits that are subject to the cutback." *Id.* at 488. Judge Greenberg explained that § 204(g) does not protect "phantom benefits which never actually will vest for the participant." *Id.* As explained above, Judge Greenberg concluded that due to the "Qualifying Termination" and "Successor Employer" provisions, the plaintiffs could never become eligible for PJS benefits. *Id.* at 489; *accord McCay v. Siemens Corp.*, 247 Fed. Appx. 172, 177 (11th Cir. 2007) ("Because the terminated employees had "continued employment" with and then were terminated by Siemens, a "Successor Employer," they do not qualify for PJS benefits from the Westinghouse Plan.") The *McCay* Court explained: "Section 1054(g) "does not override conditions originally imposed by the [pension] [p]lan." 247 Fed. Appx. at 177 (*citing Dade v. N. Am. Philips Corp.*, 68 F.3d 1558, 1562 (3d Cir.1995)). Likewise in *Shaver*, because the plaintiffs

became employed by (and were later terminated by) Siemens, they could not satisfy the Qualifying

Termination and Successor Employer eligibility conditions in the Westinghouse Plan.   Thus,

Judge Greenberg held that Siemens did not violate § 204(g) of ERISA.

        c.     *Shaver*'s Analysis of the Siemens APA

       After determining that ERISA §§ 204(g) and 208 did not require Siemens to provide PJS

benefits, the Court turned to the Magistrate Judge's alternative rationale that PJS benefits had been

contractually extended pursuant to the Siemens APA.   The *Shaver* Court noted that the Siemens

APA reflected an effective date of September 1, 1998 to ensure that Siemens would not provide

any employee benefits until after the Sunset provision had eliminated a potential claim for PJS

Benefits.   The Court held that the Magistrate Judge's reliance on the language in § 5.5(d)(i) of the

Siemens APA (that Siemens would provide benefits substantially identical to those in the

Westinghouse Plan as of September 1, 1998) was misplaced.   Judge Greenberg explained:

"Siemens' contractual promise to provide substantially identical benefits surely does not constitute

an assumption of Westinghouse Plan's liabilities, as an agreement to provide benefits is discrete

from an agreement to assume another employer's obligation to provide benefits."   *Id*. at 480-81.

The Court then closely examined other provisions of the Siemens APA which directly addressed

"Assumed Liabilities."[9]   The Court concluded that, taken together, Siemens had assumed only a

portion of the Westinghouse Plan's pension obligations in the Siemens APA.     The Court held

that Siemens did not intend to become obligated to pay PJS benefits arising under the

_____

[9] In § 2.3(a)(vii) Siemens assumed "all liabilities arising under or in connection with any Plan or
Benefit Arrangement."   However, § 2.3(b)(x) excluded "any Liabilities with respect to Plans and
Benefit Arrangements retained by Westinghouse under Section 5.5."   In § 5.5, Westinghouse
retained liability with respect to legacy employees "for their accrued benefit calculated as of
September 1, 1998."

Westinghouse Plan.

Judge Greenberg then explained that although the *Bellas* decision imposed liability on

Westinghouse, it did not impose liability on Siemens:

> We grant that at the time of the APA's execution, *Westinghouse* was nonetheless
> legally obligated under ERISA to allow for a permanent job separation to take place
> following August 31, 1998, notwithstanding the Westinghouse Plan's plain
> language to the contrary which neither we nor the district court yet had struck
> down. The *terms* of the Westinghouse Plan, however, did not obligate
> Westinghouse to provide PJS benefits after August 31, 1998, and it is the *terms* of
> the Westinghouse Plan measured as of September 1, 1998—not Westinghouse's
> underlying ERISA obligations—that Siemens promised effectively to match in the
> APA. See J.A. 138 ("substantially identical with respect to all *substantive
> provisions to those of the Westinghouse Pension Plan* as in effect of [September 1,
> 1998]"). Considering that those terms had not yet been called into question by
> *Bellas*, we find that our holding in that case cannot alter the plain language of the
> APA.
>
> Fundamentally, the APA is a contract. A basic principle of contract construction is
> that we must interpret and enforce unambiguous agreements according to their
> terms. In no uncertain terms, Siemens agreed to provide benefits "substantially
> identical to" those provided under the Westinghouse Plan as of September 1, 1998,
> and the Westinghouse Plan did not provide PJS benefits for employees terminated
> after August 31, 1998, even putting aside the fact that it did not ever require
> Westinghouse to pay benefits to employees terminated by a Successor Employer.
> Our later invalidation of the Sunset provision *as to Westinghouse* could not change
> the parameters of Siemens' *contractual undertaking* either with respect to the
> termination date of the separations for PJS eligibility or with respect to the entity
> terminating the employment, i.e., a Westinghouse employer. Nor, of course, could
> it change the Westinghouse Plan's provision that there would not be a permanent
> job separation of an employee offered continued employment by a Successor
> Employer.

*Id*. at 496-97 (emphasis in original; citations omitted).

In summary, Judge Greenberg explained that there were "three separate reasons" why the

employees were not entitled to PJS benefits: (1) the Sunset provision; (2) Plaintiffs had not

experienced a "Qualifying Termination" by the "employer" defined in the Westinghouse Plan (i.e.,

a Westinghouse affiliate); and (3) Plaintiffs had been offered employment by a "Successor

Employer" (i.e., Siemens). *Id.* at 497. He commented that as complicated as the subject-matter of the dispute seemed to be, the result was "quite clear." *Id.*

Standard of Review

Motions for reconsideration are generally disfavored. In addition, the Court notes that nearly a decade has passed since the underlying Order was entered. The Court is acutely aware of the fact that Plaintiffs have been anticipating receipt of PJS benefits for a lengthy period of time. Nevertheless, a motion for reconsideration filed pursuant to Rule 59(e) may be granted on one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not previously available; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice. *See Max's Seafood Café by Lou–Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). In this case, Northrop Grumman contends that there has been a material intervening change in controlling law and that the Court should correct a clear error of law to prevent manifest injustice. This is a compelling basis for reconsideration. Accordingly, the Court will consider Defendants' motion on its merits.

Legal Analysis

The Court turns now to the application of the legal principles articulated in *Shaver* to the facts and circumstances of this case. Northrop Grumman contends that *Shaver* mandates entry of judgment in its favor. First, Northrop Grumman cites the "Successor Employer" provision in the Westinghouse Plan, which is identical to the provision discussed in *Shaver*, and reasons that Plaintiffs can never become eligible for PJS benefits under the Westinghouse Plan because they were, in fact, offered jobs by a Successor Employer (i.e., Northrop Grumman). Second, Northrop

23

Grumman contends that the "Sunset provision" is valid as to the Northrop Grumman Plan. Defendants contend that because the APA only required Northrop Grumman to provide benefits comparable to those in effect on the date of the APA, the ERISA anti-cutback provision does not apply. Third, Northrop Grumman cites *Shaver* for the proposition that the terms of the Northrop Grumman APA trump the retroactive effect of the Court of Appeals' decision in *Bellas*.

Plaintiffs contend that *Shaver* is distinguishable because Northrop Grumman, unlike Siemens, established and maintained a spin-off of the Westinghouse Plan. Plaintiffs argue that *Bellas* and *Gillis* remain the relevant precedential opinions. Plaintiffs reason that because the Northrop Grumman Plan is a spin-off plan, it is required by ERISA to provide PJS benefits on the same terms as required by the Westinghouse Plan. Similarly, Plaintiffs contend that a Successor Employer who sponsors a spin-off plan (i.e., Northrop Grumman) steps into the shoes of and should be treated as the original employer (i.e., Westinghouse), citing I.R.S. General Counsel Memorandum 39,824, 1990 WL 698027. In addition, Plaintiffs reason that the Northrop Grumman Plan explicitly modified the terms of the "Successor Employer" provision, such that the entitlement to PJS benefits was triggered when Plaintiffs' employment was terminated by Northrop Grumman (rather than Westinghouse), without an offer of employment from a successor to Northrop Grumman.

In its reply brief, Northrop Grumman argues that the factual distinctions between the Siemens and Northrop Grumman transactions are irrelevant because *Shaver* held that it is the terms of the underlying Westinghouse Plan (identical in both cases) and the terms of the Northrop Grumman APA which control. Northrop Grumman contends that authorities cited by Plaintiffs cannot override either the "Successor Employer" provision contained in the Westinghouse Plan or the analysis set forth in *Shaver*.

24

This Court starts with the core principles identified in *Shaver*. ERISA neither mandates the creation of pension plans nor dictates the benefits to be afforded once a plan has been created. Thus, Northrop Grumman was not required by ERISA to provide PJS benefits to Plaintiffs. However, if Northrop Grumman did promise to provide PJS benefits, ERISA will ensure that if a worker has fulfilled whatever conditions are required to obtain those PJS benefits, he/she will actually receive such benefits. Only the plan itself can create an entitlement to benefits. The courts must enforce the plan as written unless a provision of ERISA mandates a contrary directive. *See Shaver*, 670 F.3d at 470-71 (citations omitted).

By its plain terms, the Northrop Grumman Plan does not provide for PJS benefits to the Plaintiffs. As Plaintiffs note, the Northrop Grumman Plan "undeniably" provided for PJS benefits from March 1, 1996 until August 31, 1998. However, the Sunset provision clearly stated: "In no event shall a Permanent Job Separation occur after August 31, 1998" and it is undisputed that the employment of Plaintiffs was not ended until 1999. Accordingly, Plaintiffs may prevail only if the Northrop Grumman Plan incorporated the Westinghouse PJS benefit or if ERISA §§ 204(g) or 208 mandate a contrary result.

a.    Section 208

Plaintiffs attempt to distinguish *Shaver*'s § 208 analysis on the ground that Siemens did not create a spin-off plan. While factually correct, this argument is substantially weakened by the fact that Judge Greenberg found that the Siemens transaction <u>did</u> implicate § 208, and then proceeded to perform a § 208 "hypothetical termination" analysis to the 1994 Westinghouse Plan.

It is readily apparent that § 208 applies to the Northrop Grumman Plan because there was a transfer of assets or liabilities from Westinghouse to Northrop Grumman. Nevertheless, the

Magistrate Judge erred in the 2002 Order by simplistically concluding that because it was a spin-off, the Northrop Grumman Plan "must provide benefits equal to those provided by [the Westinghouse Plan]." Judge Greenberg explained that § 208 is "more nuanced" than recognized by the Magistrate Judge and does not require a blanket adoption of a verbatim plan.

The Court turns now to the distinct question of whether the Northrop Grumman Plan violated § 208. The terms of the Northrop Grumman Plan are not a mirror image of the Westinghouse Plan. The Northrop Grumman APA provided that the Northrop Grumman Plan would provide benefits "comparable to the wages and benefits in effect on the date of this Agreement."[10] As Judge Greenberg noted, "comparable" does not mean "identical." Indeed, in § 1.05, the Northrop Grumman Plan is defined as a "successor" plan. Similarly, Appendix E described the Northrop Plan as a "continuation," albeit with "minor changes." One such change, of critical importance to this case, concerns the definition of "Employer" in the Northrop Grumman Plan. As Judge Greenberg explained in *Shaver*, the Court cannot treat Plaintiffs' service at Northrop Grumman as uninterrupted employment at Westinghouse.

Judge Greenberg had no difficulty in applying the §208 "hypothetical termination" test to the Westinghouse Plan and thereby determined that § 208 did not require Siemens to provide PJS benefits. The same reasoning applies here. The 1994 Westinghouse Plan contained the same "Successor Employer" and "Qualifying Termination" eligibility conditions that were dispositive in *Shaver*. The invalidation of the 1994 Sunset Provision amendment in *Bellas* did not eliminate these eligibility conditions. Indeed, the "Successor Employer" and "Qualifying Termination" provisions existed in the pre-1994 Westinghouse Plan. It is undisputed that Plaintiffs were offered

---

[10] As noted, the Westinghouse benefits in effect on the closing date were subject to a Sunset provision.

jobs by Northrop Grumman and that their employment was not terminated by a Westinghouse affiliate. Thus, after the Northrop Grumman APA, Plaintiffs could never satisfy the eligibility conditions to receive PJS benefits under the Westinghouse Plan.[11] In summary, Plaintiffs are not entitled to PJS benefits under the Westinghouse Plan. Therefore, Plaintiffs' equal inability to receive PJS benefits under the Northrop Grumman Plan does not violate § 208. The Magistrate Judge erred by failing to consider the the "Successor Employer" and "Qualifying Termination" provisions.

          b.     Section 204(g)

Judge Greenberg's analysis of § 204(g) in *Shaver* is also applicable to this case. Application of the ERISA "anti-cutback" provision to the Northrop Grumman Plan is relatively straight-forward. Judge Greenberg emphasized that § 204(g) can <u>protect</u> an entitlement to benefits "*but it cannot create an entitlement to benefits when no entitlement exists under the terms of the Plan.*" *Id*. at 486 (emphasis in original). Northrop Grumman was not required by ERISA to provide PJS benefits and the Sunset provision in the Northrop Grumman Plan is not unlawful per se. The Sunset provision in the Westinghouse Plan was invalidated in *Bellas* – as to Westinghouse -- only because it represented a reduction in the commitments <u>Westinghouse</u> had previously made to its employees.

The plain terms of the Northrop Grumman Plan never granted entitlement to Plaintiffs of PJS benefits. In the APA, Northrop Grumman promised only to provide benefits comparable to

---

[11] The Court notes that the Northrop Grumman APA (by which Northrop offered employment to Plaintiffs, thereby triggering the "Successor Employer" provision) was executed on January 3, 1996, prior to the establishment of the Northrop Pension Plan, although the APA did not become effective until March 1, 1996.

those in the 1994 Westinghouse Plan.   Thus, the Northrop Grumman Plan contained a Sunset Provision from its inception.   Plaintiffs did not and cannot meet the requirements for eligibility for PJS benefits under the Northrop Grumman Plan as their employment was not terminated until 1999. Accordingly, § 204(g) of ERISA cannot create such an entitlement.   As Judge Greenberg explained in *Shaver*, the later invalidation of the 1994 "Sunset" provision of the Westinghouse Plan could not change the limitations of Northrop Grumman's contractual agreement.

The Magistrate Judge erred by construing the Northrop Grumman Plan as an "interpretation" of the Westinghouse Plan.   It was a new successor plan established by Northrop Grumman.   As Judge Greenberg explained, treating Plaintiffs' employment by Northrop Grumman as uninterrupted employment at Westinghouse would require "judicial alchemy."   670 F.3d at 491.    In addition, the Magistrate Judge erred by failing to consider the eligibility conditions in the Westinghouse Plan.   As made clear in *Shaver*, § 204(g) does not override these eligibility conditions (i.e., the "Successor Employer" and "Qualifying Termination" provisions). *See also Dade v. North Am. Philips Corp.*, 68 F.3d 1558 (3d Cir 1995) (ERISA 204(g) did not require that workers be given credit for service at Successor Employer when sale of unit prevented them from being able to satisfy eligibility terms of former employer's plan.)   As in *Shaver*, § 204(g) does not protect phantom benefits that will never actually vest.   Thus, the Magistrate Judge's conclusion that § 204(g) invalidated the Northrop Grumman Plan Sunset provision was erroneous.

c.      The Northrop Grumman APA

The Court must also determine whether Northrop Grumman agreed to extend PJS benefits to Plaintiffs by contractual agreement.   One of the significant principles in *Shaver* is that the terms

28

of the APA are critical.   Northrop Grumman made two separate promises in the APA: (1) to

establish a Northrop Grumman pension plan to provide benefits comparable to those in effect at the

time of the transaction; and (2) to assume Westinghouse's liabilities under the Westinghouse

pension plan.   Notably, Northrop Grumman's promise to create its own pension plan to provide

comparable benefits to the former Westinghouse employees was distinct from its assumption of

risks with respect to the Westinghouse Plan.

The Northrop Grumman APA and the Siemens APA are materially different with respect to

the assumption of the pension liabilities of Westinghouse.   Siemens took great pains to avoid any

ERISA liability for PJS benefits.   In stark contrast, Northrop Grumman broadly assumed

contingent and unknown liabilities regarding PJS benefits and no such liabilities were retained by

Westinghouse regarding Plaintiffs.   Put another way, the risk that the 1994 amendment of the

Westinghouse Plan would subsequently be found in *Bellas* to violate ERISA, and thereby

potentially increase the PJS benefits due to former Westinghouse employees, was allocated in the

Siemens APA to Westinghouse.   In the Northrop Grumman APA, that risk was allocated to

Northrop Grumman.[12]

*Shaver* does not undermine the determination in *Bellas* that the 1994 amendment to the

Westinghouse Plan violated ERISA.   Nor does it undermine this Court's 2005 conclusion that in

the Northrop Grumman APA, Northrop Grumman assumed the risk of unknown, contingent

---

[12]However, the Northrop Grumman assumption of liabilities was not unlimited.   The language in
Appendix E § E.01(b) by which Northrop Grumman assumed the liabilities of the Westinghouse
Plan limited that undertaking to "those participants of the Westinghouse Plan who became
Employees of the Northrop Grumman controlled group."   Thus, Northrop Grumman assumed the
liabilities only of former Westinghouse employees who, by definition, satisfied the Westinghouse
"Successor Employer" provision.

liabilities related to the Westinghouse Plan. Further, as *Gillis* held and IRS GCM 39824 affirms, when a successor employer has assumed the assets and liabilities of the original employer's plan, an employee who continues in the same job for the successor employer may work towards satisfying the requirements under the original employer's plan. Nevertheless, the application of these principles to the instant case does not make Defendants liable.

The Northrop Grumman and Siemens APA's are similar as to their respective duties to provide pension benefits to the former Westinghouse employees. In each APA, the acquiring corporation agreed to provide benefits comparable to those in the 1994 Westinghouse Plan. Neither Northrop Grumman nor Siemens ever promised to provide PJS benefits beyond the Sunset provision. Pursuant to *Shavers*, the later invalidation of the Sunset provision – as to Westinghouse – cannot change the parameters of the contractual understanding. 670 F.3d at 496-97. As explained above, *Shaver* casts substantial doubt on the Magistrate Judge's decision that the Northrop Grumman Plan is in violation of ERISA.

Ultimately, the distinction between the liabilities arising under the Northrop Grumman Plan and those arising under the Westinghouse Plan is moot. Under the Westinghouse Plan, as discussed above, Plaintiffs are unable to satisfy the eligibility requirements to receive PJS benefits due to the "Successor Employer" and "Qualifying Termination" provisions. As such, even though Northrop Grumman assumed the risk of the *Bellas* decision, liability does not exist. Under the Northrop Grumman Plan, Plaintiffs are equally unable to satisfy the eligibility requirements to receive PJS benefits due to its Sunset provision. Thus, Plaintiffs are not entitled to PJS benefits under either plan.

Consequently, in closely analyzing *Shaver*, it is apparent that the Magistrate Judge made a number of legal errors in the 2002 Order, including: (1) the failure to consider the impact of the

"Successor Employer" and "Qualifying Termination" provisions in the Westinghouse Plan (both pre- and post-1994); (2) the failure to closely analyze the terms of the Northrop Grumman APA; (3) the failure to recognize that § 208 is nuanced and does not require a blanket adoption of a verbatim spin-off plan or benefits equal to those of the Westinghouse Plan; (4) the characterization of the Northrop Grumman Plan as an "interpretation" of the Westinghouse Plan to which § 204(g) is applicable; (5) the mis-application of *Bellas* and *Gillis*; and (6) having engaged in the "judicial alchemy" of treating Plaintiffs employment at Northrop Grumman as uninterrupted service at Westinghouse.

In summary, this Court is convinced, in light of *Shaver*, that the 2002 Order was incorrect. Northrop Grumman did not violate ERISA § 204(g) when it adopted the Northrop Grumman Plan which contained a Sunset provision regarding PJS benefits. Plaintiffs had not satisfied the eligibility conditions for PJS benefits under a hypothetical termination formula just prior to the transfer of Westinghouse's liabilities to Northrop Grumman and they can never become eligible. Thus, §§ 204(g) and 208 did not protect the PJS benefits from cut-back. Due to Successor Employer and Qualifying Termination provisions, Plaintiffs are not eligible for PJS benefits under the Westinghouse Plan, and therefore, their ineligibility to receive PJS benefits under the Northrop Grumman Plan does not violate § 208. Finally, Northrop Grumman did not obligate itself to provide PJS benefits to Plaintiffs in the Northrop Grumman APA. Because no provision of ERISA requires otherwise, the Northrop Grumman Plan will be enforced as written.

Count II – Breach of Fiduciary Duty

The 2002 Order was limited to Count I of Plaintiffs' complaint. In Count II, Plaintiffs alleged that "the conduct of [Northrop] Grumman in incorporating the illegal Amendment into its

Plan and in failing to inform Class members of their eligibility for PJS pensions under the pre-Amendment terms of the Plan violated [Northrop Grumman's fiduciary duties under 29 U.S.C. §§ 1104(a)(1)(A), 1104(a)(1)(B), and 1104 (a)(1)(D).]"  *See* Pls.' Compl. ¶¶ 39–42.  Section 1104 provides, in pertinent part:

> (a) Prudent man standard of care
>
>> (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
>>
>>> (A) for the exclusive purpose of:
>>>> (i) providing benefits to participants and their beneficiaries; and
>>>> (ii) defraying reasonable expenses of administering the plan;
>>>
>>> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>>>
>>> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104.   Under § 1104, Northrup Grumman owed a fiduciary duty to the Plaintiffs to administer the Plan with reasonable prudence in the interest of the plan participants and their beneficiaries in accordance with its terms.   In *Seborowski v. Pittsburgh Press Co.*, 188 F.3d 163, 169 (3d Cir. 1999), the Court explained:

> In order to succeed on their breach of fiduciary claims, Appellants must prove that the trustees in bad faith failed to follow the terms of the plan. *Burke v. Latrobe Steel Co.*, 775 F.2d 88 (3d Cir.1985). An essential element of this showing is that the trustees in fact failed to follow the terms of the plan.

As indicated above, Plaintiffs were not entitled to PJS benefits under either the Westinghouse Plan or the Northrop Grumman Plan, irrespective of the 1994 amendment to the Westinghouse Plan, due

to the "Successor Employer" and "Qualifying Termination" provisions. Further, as *Shaver* makes clear, the inclusion of a Sunset provision in the Northrop Grumman Plan did not constitute a violation of either § 208 or § 204(g) of ERISA. Plaintiffs have therefore failed to establish that Northrop Grumman breached any common-law requirements of loyalty or prudence codified in §§ 1104(a)(1)(A) or (B), or that Northrop Grumman administered its Plan in a manner contrary to its terms under § 1104(a)(1)(D). Accordingly, Defendants are entitled to summary judgment on Count II of the Complaint.

Conclusion

The Court recognizes the unfortunate impact of this decision on the expectations of Plaintiffs. Nevertheless, the Court is convinced that the binding precedential opinion in *Shaver* compels the conclusion that Northrop Grumman does not have a duty to provide PJS benefits to Plaintiffs under the facts and circumstances of this case. Thus, the Court will vacate the 2002 Order and enter judgment in favor of Defendants.

In accordance with the foregoing, DEFENDANTS' MOTION FOR RECONSIDERATION (Document No. 157) will be **GRANTED**. The 2002 Order will be vacated. Although the 2002 Order addressed only Count I of the Complaint, the Court concludes that the breach of fiduciary duty claim in Count II of the Complaint must also fail as a matter of law for the reasons hereinabove

set forth.   Thus, summary judgment will be entered in favor of Defendants and the case will be

closed.

An appropriate Order follows.




McVerry, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


**STANLEY PIESESKI and PATRICK KOST,**

|                                          |     |                |
|------------------------------------------|-----|----------------|
|                                          | )   |                |
| **Plaintiffs,**                          | )   | **2:01-cv-993** |
| **v.**                                   | )   |                |
|                                          | )   |                |
| **Northrop GRUMMAN CORPORATION and**     | )   |                |
| **Northrop GRUMMAN ELECTRONIC**          | )   |                |
| **SENSORS & SYSTEMS DIVISION**           | )   |                |
| **PENSION PLAN,**                        | )   |                |
|                                          | )   |                |
|                                          | )   |                |
| **Defendants.**                          | )   |                |

## MEMORANDUM ORDER OF COURT

AND NOW, this 23rd day of July, 2010, it is hereby **ORDERED, ADJUDGED and**

**DECREED** that this Court's Order of June 22, 2002 is **VACATED**; DEFENDANTS' MOTION

FOR RECONSIDERATION (Document No. 157) is **GRANTED;** and **JUDGMENT** is entered in

favor of Defendants and against Plaintiffs on Counts I and II.

DEFENDANTS' MOTION PROPOSING FINAL REMEDY (Document No. 150) is

**DENIED AS MOOT**.

The Clerk shall docket this case closed.


BY THE COURT:


s/ Terrence F. McVerry
United States District Court Judge

cc:    David B. Rodes, Esquire
Email: drodes@gpwlaw.com
John T. Tierney III, Esquire
Email: jtierney@gpwlaw.com
William T. Payne, Esquire
Email: wpayne@stargate.net

Carl G. Roberts, Esquire
Email: cgroberts@ballardspahr.com
David S. Fryman, Esquire
Email: Fryman@ballardspahr.com
Mary-Jo Rebelo, Esquire
Email: mrebelo@hh-law.com